MAYOR AND ALDERMEN OF THE CITY OF JACKSON *v.* JAMES H. BOWMAN.

1. CORPORATION: MUNICIPAL: POWERS OF, IN REFERENCE TO RETAILING.—It is no part of the corporate franchises of the city of Jackson, or of other incorporated towns in this State having two thousand or more inhabitants, to grant licenses for retailing. Their power to grant such licenses is derived from a general law of the State, imposing upon such corporations a public duty, to be exercised in accordance with law, and for the public good.

2. CONTRACTS: ILLEGAL, VOID.—A contract which obliges one of the parties to do an act in violation of law, or restricts the free exercise of a discretion

vested by law in a public or municipal officer in reference to a trust reposed in him, or which contemplates such violation of law or destruction of the free exercise of a public duty, is a nullity. See *Jerrett* v. *Bartlett*, 21 Verm. R. 184; *Wooten* v. *Miller*, 7 S. & M. 385.

3. SAME: CASE IN JUDGMENT.—A contract by which a municipal corporation having two thousand or more inhabitants agree, in consideration of the erection of a commodious hotel within the corporate limits, to grant to the builder the exclusive right to retail in the corporation for five years, at the lowest rate of license allowed by law, and to refund the license-money so paid, and in case the corporation grant license to another, then that it would donate five thousand dollars in aid of the erection of the hotel, is contrary to law and public policy, and utterly null and void.

4. SAME: SAME: EFFECT OF STATUTE AUTHORIZING THE CARRYING OUT OF AN ILLEGAL CONTRACT.—An Act of the Legislature which merely authorizes and empowers the corporate authorities of a city to carry out a contract which they had previously made, by which the exclusive right to retail was granted for five years, to aid in the erection of a hotel within the city, does not *per se* validate the contract; and if the corporate authorities refuse to carry out the contract, they may insist on its illegality, notwithstanding the passage of the Act.

ERROR to the Circuit Court of Hinds county. Hon. John Watts, judge.

Bowman brought his action of covenant against the Mayor and Aldermen of the City of Jackson to recover five thousand dollars under the contract set out in the opinion of the court. He alleged full performance of his part of the contract, and assigned for its breach on the part of the defendants that they had granted license for retailing within said city to one Franceola.

The defendants demurred to the declaration, which, being overruled, they filed their pleas.

1. Denying performance on the part of plaintiff of his part of the contract; and on this plea there was an issue and a trial, and a verdict for plaintiff for five thousand dollars.

The plaintiff's demurrer to the second and third pleas was sustained, but it is not necessary to set them out, as this case was decided in this court upon the merits of defendants' demurrer to the declaration.

The defendants below sued out this writ of error.

*W. P. Harris,* for plaintiffs in error.

The leading defence in this case rests upon the invalidity of

the contract sued on. The contract is, first, to be examined by the law in force at the time it was made; and, second, by the Act of 1857, (the obvious purpose of which was to enable the corporation of the city of Jackson, or the city authorities, to carry out its stipulations and to protect the plaintiff from the consequences which the general law might attach to retailing without license, on the supposition that the contract with the city authorities might be treated as invalid and a mere evasion of the provisions of the tippling law.)

On the first branch of the subject, it is to be observed that the contract may be considered with reference to the power of the city under its charter to make such contract, as tested by the charter alone.

II. As to the object and scope of the contract being to secure to the plaintiff a monopoly of the liquor-trade in the city—an exclusive privilege—it is to be considered in reference to the legal policy on that subject, and the constitutional prohibition of monopolies or exclusive privileges.

III. The contract by the corporation considered with reference to its conflict with a general statute on the subject of licensing tippling-houses.

On the second branch of the subject, the Act of 1857 is to be considered with reference to the intention of the Legislature and legal effect of the Act; and, second, as to the power of the Legislature, and this latter in two aspects: the power to render a contract, void in its inception for illegality, valid; 2d, the power to confirm a transaction securing the exclusive right to exercise a lawful occupation.

I. As to the effect of the terms of the contract and the object of it upon the provisions of a general statute. This leads us to consider the general law.

The power to grant license to retail vinous and spirituous liquors is not derived from the charter of the corporation, and is not one of the powers comprehended in the mass of police power which the *charter* confers. It does not belong to the corporation as such as a franchise, but is a power conferred for the public benefit by a general law operating on the whole State. The power is derived, not from the charter or any amendment

thereof, but from the liquor law of 1842—Hutch. Code, 270—which law, as it affects Jackson, has been altered in one respect, and that is, in the Act of 1846 dedicating the moneys arising from liquor license to "the education of poor children and the support of paupers"—Acts, 1846, p. 105; and as it affects the State at large by the Act of 1854, (p. 137,) which adds one other qualification to the grant, and that is, a majority of legal voters shall sign the petition, &c.

The corporate authorities of the city therefore occupy the same relation to the statute which the board of police occupy towards it, and have no more power over it. The city authorities of a town having two thousand or more inhabitants are intrusted with the power to grant license. The extent of their power and their discretion is measured with great precision by a public general law, which prescribes the terms on which the applicant shall be entitled. He must be a free white person, resident in the city; license to last for a period of twelve months; obtaining the recommendation of five freeholders, &c., (now majority of voters of the town;) paying the sum fixed by the authorities, not less than two hundred dollars nor more than one thousand dollars, into the treasury; filing bond, with certain conditions as to the conduct of the business, &c. It is, therefore, not a trust under a charter, but a duty under a general law, that the authorities for the time being, appealing to the statute and not to the charter, are required to perform.

The Act in its provisions is a complete and definite regulation of the business of retailing vinous and spirituous liquors. The policy of the Act of 1839, which abolished retailing business, was abandoned and the Act repealed, and in its place was adopted a statute regulating it, having two well-defined objects: to control and meliorate the practice, and to *raise revenue*. This revenue, by the Act of 1846—the Common School Law—was directed to purposes of education, and so remains dedicated in this city. The city authorities had no more power to alter, modify, or control these regulations than they had to alter any other general statute which operated on the city. They could not, by resolution, ordinance, or contract, alter or abolish these regulations. They could not add to the conditions on which license should be

granted; clearly they could not dispense with these conditions. The board of police, in making a contract for the erection of a court-house or jail, or a bridge, could not make compensation therefor by a contract that the members of the board should grant liquor license to the contractor for five years, free of charge, and would not grant license to any other person except on onerous conditions not specified in the statute. To hold that such a contract is valid seems rather the presentation of a broad caricature, than to state a proposition of law or good sense.

The policy of this law was to impose certain restrictions, as indicated by its plain provisions; among these were, that no license should be for a longer period than twelve months, and that the party should pay at least two hundred dollars into the treasury for the education of the poor; and that he should obtain the consent of the majority of voters, and give bond with conditions. An ordinance or contract the object and scope of which is to wipe out these conditions, and substitute in their stead the condition of building a tavern, &c., is against both the letter and spirit of the law.

The contract is the act of the corporation, or at all events the acts of persons assuming to exercise powers supposed to reside in them by virtue of the charter. This contract or act of the corporation has reference to the manner in which the authorities of the city shall perform, not a duty arising under the charter, not a power belonging to it as a corporation, but a public duty under a general law of the State. The corporation attempted, by a combination with an individual, to control the conduct of persons or bodies, not responsible to the local constituency, or to the corporation, for the manner in which they exercise the particular power, but to the State of Mississippi. That there is want of power and capacity to affect or abridge the powers exercised under a public general law is perfectly obvious, and that the contract in no way by its *legal force* actually abridged these powers is perfectly obvious; but the light in which we now seek to present the transaction is not that of a contract ineffectual for want of legal capacity or power in the contracting parties, but a contract vicious because its direct tendency is to interrupt and obstruct the course of public law, and violate or render nuga-

tory the provision of a public general statute. The contract was an inducement to violate a public duty, to nullify a public law. It is sufficient that such was its object, and that such would be its effect if carried out according to the intent of the parties. Of course the corporation of the city of Jackson has no power as such to interfere with the performance of this duty.

It becomes important, then, to fix the character of this contract, its objects, and plain tendency.

The object of the parties to the contract, disclosed by its own terms, was to encourage or induce the building of a hotel in this city; and this encouragement or inducement was to be in the shape of a *monopoly* of the retail liquor-trade in this city. It is not material to inquire at this point into the power of the corporation to embark in such an undertaking; nor does it matter that a plausible argument may be made that the object was one of public utility in the city; nor that it had the effect to induce the expenditure of capital. The inquiry is limited to a consideration of the legal propriety of the means employed. The means employed was a combination of the then board of city authorities with Bowman to secure to him a monopoly of the retail liquor-traffic in this city—an object itself unlawful, but this object was to be obtained by a perversion of the provision of a public general law. The direct object of the contract was to control the exercise of a power and duty under the statute to the end that James H. Bowman might enjoy the exclusive privilege of retailing vinous and spirituous liquors in the capital of the State for the period of five years, without paying the license duty. That this was the manifest object it is impossible to entertain a doubt.

The city authorities bind themselves that *they and their successors shall issue* license to James H. Bowman, on his procuring the assent of a majority of the legal voters of the city, each year, annually, for five years, he paying the lowest license duty of two hundred dollars, which license duty is to be paid back to him as a donation or "further donative," and they bind themselves that neither they nor their successors will, during that period, grant license to any other person, unless such person shall (in addition to the requirements of the law) bind himself to erect a hotel in

the city costing not less than forty thousand dollars; and in case of refusal to grant license on the above terms to Bowman, or granting license on other terms than as above stated to any other person, the city is to pay five thousand dollars as damages. The statute declares that no license shall issue for a longer period than twelve months. The object of this provision was to enable the authorities to alter the terms as to the amount to be paid, so as to meet changes in the condition of the country. This among other objects; certainly it was not intended that the city authorities or the board of police should fix the *annual* tax in favor of a particular individual. It was to be uniform for all; should stand for twelve months only. The contract, therefore, while it could not clothe him with legal authority to retail for a longer period than twelve months—a license for a longer period being void by the express terms of the law—yet it fixed in his favor the license tax for five years. The corporation could not, under the penalty of five thousand dollars, *refuse* him license, provided he paid two hundred dollars, and complied with the condition as to the assent of a majority of legal voters; thus preventing the city authorities from altering the license tax for five years, although power and discretion had been given on that subject. Thus the city bound itself to give him license annually at a fixed rate for five years, and while the forms of law are to be enacted the substance is nullified. While thus bound to Bowman, they take from themselves the power to grant license to another, whatever the condition of society or the policy of future boards dictate. To show that it was in its effect a broad discrimination in Bowman's favor, it is only necessary to say that, after that contract, Bowman was entitled to license at two hundred dollars per year for five years, while any other person must not only pay the two hundred dollars, or such sum as the board might impose, and otherwise comply with the general law, but must also expend forty thousand dollars, and this for a license to retail for twelve months.

It is needless to say that this imposed a restriction on the exercise of the power conferred by statute, but it excluded competition and was so designed. The object was not to obtain a multitude of hotels, but obviously to secure Bowman against

competition. It cannot be pretended that other parties were placed on an equal footing with Bowman. The city was compelled to grant license to Bowman at a fixed rate for five years. No other party stood or could stand on that basis. It is sufficient to say that the contract provided for license to issue immediately to Bowman, and from that time no other person could obtain them, except upon conditions so onerous that it is clear that none would fulfil them.

Whether we view the Act of 1842 and its amendments as vesting an uncontrolled discretion to grant or to refuse license, even where the applicant has complied with all the requirements of law, or as imposing a duty to issue them to a fit person, recommended as the law directs and complying with the terms of the statute as to payment of the tax and execution of the required bond, the contract is equally obnoxious to the statute in both aspects of it. Where a statute confers powers on public officers, with a full discretion as to the manner of their exercise, and as to times and persons, it is as much part of the design of the law that the *discretion should continue as that the power should continue*. A contract, therefore, between the functionary and any party, that the power shall be exercised in his favor only, and upon fixed terms which gives a right to demand it to the party who seeks to have it exercised, which thus takes away the discretion of the incumbent and his successors, in its direct and obvious tendency perverts the law, places the power really out of the hands to which it was intrusted, and subjects it to a regulation not contemplated by law, and is most mischievous and dangerous to the integrity of its administration. Bowman gets the liquor license by contract with incumbents of the office for the time being; their successors cannot refuse to grant him the license, and have no power to alter the price of the privilege.

In the other view of the statute—to wit, that it becomes the right of a party on paying the tax or license fee, and producing the required recommendation and tendering bond, to have license granted to him—the violation by the contract is equally manifest. It is more palpable, perhaps. And this view of the statute seems to be the correct view. It could not have been the intention of the Legislature to put it in the power of the board of

police to create a monopoly, or to favor a particular person. The statute, in prescribing the terms on which the applicant may obtain license, and in guarding by so many detailed regulations against the abuse of the privilege, seems to have considered that no discretion was given to the board, except in fixing the tax and judging the sufficiency of the bond and recommendation.

There is no view which can be taken of the statute, however, which does not still present this contract as intended to take the place of the public law, as designed to interfere with its operation, and to secure to one person a privilege which is clearly open to all by limiting and controlling the judgment and discretion of those who have the power to confer it.

But there is another point in which its stipulations subverts the plain object of the law. The statute is partly a revenue law and partly a restraining regulation. The tax is part of that restraint, and does operate as such. The fund arising from liquor license is dedicated to the "education of poor children and the support of paupers." There is a stipulation in the contract that the license tax paid by Bowman shall be repaid to him as a donation towards the erection of the hotel.

No doubt can arise in the mind of any one that the object of this stipulation was simply to evade a positive provision of the statute, and that Bowman was to have his license as a gratuity. The forms of law, however, were to be complied with. He was to pay the tax to the treasurer, and the treasurer was to hand it back to him. If the object was to evade the provision of the statute—and it plainly was—we think it renders the contract void. But suppose that we are to regard it as a payment of the tax, and the contract appropriates it to Bowman: this would be a palpable violation of law. The stipulation cannot be viewed in any other light than in exempting Bowman from the payment of the tax. If the city had designed to make Bowman an appropriation of money, it would not have found it necessary to have connected it with the liquor tax. If it is assumed that the city might properly divert the tax, and confer it on Bowman, or that it was a fund coming to the city which the city could remit, or that the city could thus incur a debt to the school fund, and pay it by taxing the inhabitants, we say that on neither pretext was

the stipulation lawful. The city has no power to remit the tax, and to give away what was dedicated to schools from that source on the idea that it could be refunded by taxing the inhabitants of the city, is to violate the plain object of the grant, which was, that the city should have *this resource added to its resources derived from the taxing power under the charter*.

Under the original law, the board of police could not have remitted the tax due the county; and an order to refund the sum, paid in, to the applicant would have been a flagrant violation of law. This resource was added to the ordinary revenue, that the taxes to that extent might be licensed. The object was to make the vice pay money for the expense of the government; and to throw the burden of supporting the vice on the people would be the most palpable subversion of the statute which could well be conceived. On these suggestions we are content to rest this branch of the argument as to the intent of contract to interfere with the duty of public officers and the operation of a general law, to wit, the Act regulating the retail liquor-traffic.

The object of the contract, as we have insisted, being to secure Bowman the exclusive privilege to retail vinous and spirituous liquors, the next point which naturally arises is, as to the effect of this purpose, considered with regard to the general law on the validity of the contract.

We maintain that where a general law has given power to public officers to grant license on particular terms to exercise trades, or to engage in particular traffic, that a *sale* of the privilege by the officer, or a contract by which he grants a privilege to one and binds himself to prevent all competition by refusing to grant the like privilege to others, is void. The common law condemns all contracts creating or *tending* to create monopolies, even between private persons. Chitty on Con. 669. The principle applies with the same force to regulated traffic as any other traffic. Those trades and pursuits which are restricted to licensed persons are nevertheless open to all who may comply with the law as sources of profit. It is a business, a trade, although subject to regulation and carried on under license. It is nevertheless a lawful means of gain open to all. A public officer could not legally bind himself to refuse to grant it to more than one person,

or bind himself to grant it to one person. The tendency is to create a monopoly of a business or trade, and to affect the fair operation of the laws of the land.

Any combination to create a monopoly through the agency of public officers, especially, is repugnant to the principles of the common law. We think, besides, that it is beyond the power of corporations or the Legislature to confer the exclusive right to sell liquor in quantities less than one gallon in the State or in any city of the State, except in consideration of public services. The provision of the bill of rights may have had reference to political privileges, but there is enough in the constitution itself, and the history of constitutional restrictions, to show that it meant something more. No one acquainted with the history of our race can come to the conclusion "that restrictions of trade, which are admitted always under the specious color of the public good," as Lord Bacon observes—that monopolies—were not intended to be prohibited. In some of the State constitutions monopolies are mentioned by name, but our bill of rights uses the broad language—exclusive, separate, public emoluments or privileges from the community. This would interdict the government from conferring the exclusive right to sell corn or whiskey.

It is difficult to tell what political privilege could be conferred, supposing the bill of rights to have no existence as part of the constitution. What are political privileges? The elective franchise, the qualifications for office, the terms of offices, the principle of representation, are all defined and fixed by the constitution; titles are abolished. No legislative power ever gave more offence to our ancestors than this one matter of granting to one man or set of men the exclusive privilege to trade in particular commodities and in particular countries, and it does seem to us that to hold that our Legislature has such power under a constitution so guarded in matters of less grievous concern, is to forget our history and to pervert plain language. "Exclusive privilege" does not mean political privilege only, and certainly there is no reason for restraining its meaning to that. According to our understanding, the constitution deals alone with political rights and privileges, and in fixing the representation, the form of government, the qualifications of offices, the elective franchise, and

the terms of office, there is nothing left to be properly called political privilege. The force of this objection makes it applicable to the Act of the Legislature in authorizing the corporation to carry out the contract, as well as to the corporation in the outset. There was a want of power in the corporation to make such a contract—that is, the charter does not confer power on the corporation or its authorities to bind the city by such a contract.

Even if we suppose the city to have legislative power and control over the liquor license, which it clearly has not, it was not competent for the board to bind the city by a contract taking away the legislative discretion; nor would the exercise of its legislative discretion violating the terms of the contract subject the city to the payment of damages or penalty. The authorities on this point are clear, but the reason of the thing is enough. The city authorities had no right to enter into a bond to pay Bowman for building a hotel, nor contribute towards the expense.

We have shown, however, that it was not the intention of the Legislature to give to the corporate authorities any legislative power over the subject. The officers of the corporation, who for the time being answered to description of city authorities, performed the same functions which were required of the boards of police in like cases. The question on this head, therefore, is to be divided into the question of the right of the corporation or board of police to interfere with the statute, considered with reference to its object, policy, and provisions; and the question of the power of the corporation by its authorities to make contracts under *its charter.* If we were to assume that the corporation had all the power to make contracts which belongs to a natural person, still this would only authorize it to make legal contracts; and its contracts would still be liable to the objection of violating public policy, or the provisions of a prohibitory law.

The want of power under the charter to make such a contract is manifest. 5 Cow. 538; 7 Id. 585; 1 Sneed's Tenn. R. 700; 22 Conn. R. 552; 2 Denio, 110.

It is proper, before proceeding to consider the effect of the Act of 1857 on the contract, to notice the argument founded on the supposed merit of the transaction and the absence of any taint

of personal benefit to the officers themselves. It is difficult to imagine the state of things to have existed, as is supposed, in the capital of the State, that the want of a hotel had become so far a public necessity that the city government was called on to make provision for it. Let it be assumed, however, that the city would have suffered from dearth of visitors; still the question recurs, had the corporation the right, in order to promote its own interests—a private interest considered with reference to the State— by a contract of this kind, to employ a power held under a general statute, not with reference to the policy and object of that statute, but as an instrument by which to purchase a benefit to the city—the building of a market-house, city hall, church, livery-stable, theatre, or the like? Had the city the right to sell the exclusive privilege for a round sum of money, to pay off its debt, and to relieve the inhabitants of a heavy burden? To admit such a power would be a perversion of common sense.

In the case of *Monet* v. *Jones,* 10 S. & M. 237, the commissioners or board had a discretion in locating the court-house and the right to judge as to the propriety of a location. The expense of a change of site was a material element in the decision of the question, and they had express authority to accept donations in aid of the building. Certainly the expense which was to fall on the county was among the chief considerations, and any arrangement to diminish this expense consistent with the main object of the power was a positive duty. But in regard to the tippling law no such discretion was invested in the municipal council.

We do not cite the Act of 1857 as an argument to show that the contract sued on is invalid. We simply remark that it does not excite surprise that the party relying on such a contract should want the confirmation of the Legislature, or seek such healing power as the Legislature might possess to cure its infirmities; and proceed to consider the character of the Act itself.

Was this Act intended to have a retroactive effect on the contract, so as to render it valid *ab initio,* or was it intended merely to empower the corporation to do what was unlawful for it to do when the contract was made? Was the Act intended to say, you shall perform the contract, or you are liable to perform it, or merely to say, you had not the right and power before to do

what you contracted to do; we now give you that power, and you may carry out the contract if you see fit. To give the Act the effect of rendering the contract valid *ab initio* or of a legislative declaration to perform the contract *nolens, volens,* is to give it retroactive operation, and more, it is to invest it with the character of a judicial sentence. To give it the effect of a legislative grant of *power,* to do or not to do as the city authorities might think fit, is to render the Act prospective and legitimate legislative action.

For the Legislature to declare a contract, totally void because illegal as well as for want of capacity, valid and binding, is a judicial sentence on the contract, and not a legislative act. No one ever questioned the impropriety of such action by the Legislature generally, but it is positively obnoxious to a constitutional objection. So dangerous and so questionable is this power to legislate backwards that, in cases where it is admitted to reside in the legislative body, the courts say it is never to be presumed from doubtful and ambiguous language; that the contrary is to be inferred unless the intention is manifest. In other words, all statutes are to be held to operate on the future and not on the past, unless, by its express language, or intention manifest from its provisions, the past is necessarily referred to.

The Act of 1857 was designed merely to confer power on the corporation of the city of Jackson to fulfil the terms of the contract—or, in its own words, to "enable" it to carry out the contract—on the idea that there were legal obstacles to its performance: 1st, it was in its origin contrary to public policy, because designed to interfere with the object, policy, and operation of a public statute; 2d, the city government had no power to make such a contract. It was not intended to create a legal obligation out of a past transaction which did not create such obligation, or to declare valid what was void. In other words, it was not the intention of the Legislature to give to the statute a retroactive operation, but a prospective operation. We think this evident from the Act itself. The hotel was completed at the date of the passage of the Act, and Bowman desired to have the benefit of the contract in future, having already enjoyed it up to that time, and to be freed from the

liability to prosecution for having already violated the liquor law by selling under a license obtained without paying for it, and under a contract the object of which was to evade the provisions of the statute. The city authorities were disposed to give him the five years' exclusive right to sell, but it had not the power to confer it. The preamble assumes that the corporation or city government is willing to carry out the contract, and the Act gives them the power to do so, while it also grants a pardon to or exempts Bowman from prosecution for the past. The language of the Act is peculiar. The Legislature of that session was marked by the presence of some very able men and lawyers. They were familiar with the difficulties surrounding retrospective legislation, with the uniform concurrence of courts and text-writers in condemning that legislation which invaded the province of the courts, to pronounce on past transactions, to create obligations, and to disturb rights—a legislation which nothing but "intolerable public grievance" can justify in any case, and which, when it aims to create new obligations or disturb rights, is void. They were not ignorant of the rule, moreover, that declares that the Legislature is never to be supposed to intend to legislate as to a past transaction, so as to alter its legal character and affect the person and property of the parties; which rule, as it is expressed by Parker in *Medford* v. *Learned*, 16 Mass. R. 215, and cited in Smith Com. 295: "For no legislator could have entertained the opinion that a citizen free from debt by the laws of the land could be made a debtor by a legislative act declaring him one." No one could fail to see that to declare a contract to be binding which was not so at the time it was entered into, which was an absolute nullity by the law existing at its date, was in effect to create an obligation by a legislative decree. It was also very well known that statutes of pardon or acts exempting parties from penalties were by common consent considered valid, and not so obnoxious to the principles of right, since, in point of fact, they merely prescribed a rule for the State authorities in regard to past offences, which rule was for the benefit of the offender. These laws merely say to the State authorities, You need not or shall not prosecute for these offences. Statutes of oblivion or pardon have always been regarded as valid. See observations of

Smith, Com. on Stat. and Const. Law, 303.   On looking at the Act, it will be seen that, when dealing with a private contract, the language points to the future—" hereby authorized to carry out the terms," &c.; but, when dealing with the offences of Bowman, the language and context are explicit in giving a retroactive effect.   The statute is a most creditable example of legislative action on this subject, observing the distinction between Acts operating on the government and those which affect the citizen. Id. 303, 304.   This supposes that "accepting" refers to the past, because, if the privilege to be conferred became lawful, of course it would be no offence in B.

This court has condemned retrospective legislation in strong terms; and has laid down the rule in all its rigor construing statutes.   *Garret* v. *Beaumont,* 24 Miss. R. 377; Sedgwick on Const. Law, 190–194.

This rule of construction that the Act is never to be construed to have a retrospective operation unless the language is explicit, or the intention manifest beyond all doubt, taken in connection with the language of the Act, clearly show that the Legislature intended to free Bowman from criminal responsibility for the past and to give permission to the city government to secure him in the stipulated privilege, but not to give a judicial mandate that they should do, or to declare that the contract of 1856 was valid or should be held valid by the courts.   To give it any other operation is to violate the settled rule of construction, and cause the Act to conflict with the principles of the constitution.   It is impossible for any man endowed with healthy reasoning faculties to draw any substantial or real distinction between a statute which says I shall *pay a debt* I don't by law owe, and a statute which says I shall take a bank note out of my pocket and give it to A, or that A shall have the horse I own.   To say that it is to "establish a contract"—a right—and not to impair it, is a mere trick in phraseology.   If the obligation did not exist, the statute creates the obligation, and it is as bad to create an obligation as it is to add terms to an existing obligation.   In the one case you make part, in the other the whole obligation.   The precedents on this subject are in conflict, but it will be observed that the strongest cases favoring legislation on past contracts proceed on

the idea that the Legislature is altering a "rule of evidence" or "supplying a remedy." In Pennsylvania, the courts had gone to such lengths that it called forth the language of Gibson, J., in *Greenough* v. *Greenough*, 11 Penna. State R. 194. It is difficult to see the difference between a will defectively executed so as to leave an intestacy, and a married woman's *deed defectively executed* so as not to *pass her title.* In the latter case, however, the court said that the certificate of acknowledgment was merely evidence, and that, while the statute had required the privy examination, it had not prescribed the rule of proof; and the Legislature, in declaring that certain *defective certificates* should *amount to proof,* merely altered a rule of evidence, and proceeded on the supposition that *the proper examination had taken place* and that *title actually passed.* 1 Watts, *Mercer* v. *Watson.* Here we would be bound to decide differently, because the certificate is essential to pass the title. See 12 Ohio R. 394, where that court has overturned the decision. See Chief Justice Parker's observations in *Medford* v. *Learned,* 16 Mass. R. 215. "If it be true that this statute, instead of providing a remedy for an existing contract, must be construed to create a debt or obligation on a consideration which had passed, and which was not of itself *a legal* foundation for a promise, it would seem very clear that the statute was enacted improvidently, and that it could not have the intended operation." Apply this sound view with the case of Hertz, in 4 S. & R. In the latter case the court undertakes to say that a "remedy" was supplied only.

The provision in the constitution which prohibits the exercise of judicial power by the Legislature is sufficient to condemn any law which compels me to perform a contract which did not legally bind me when it was made. The Act of 1857 *does not say that the contract is ratified and confirmed, or hereby declared valid.* It is obvious that the Legislature intended to leave Bowman to depend on the good will of the city authorities in the future, contenting themselves with simply taking away all legal obstacles to the exercise of that will. It cannot be supposed, as the language does not convey that meaning, that the Legislature intended to enact a mandate, or to alter the legal character of a past contract. Smith Com. 292.

It is impossible to escape the conclusion that such a mandate conflicts with the principles of the constitution. We refer to the argument of the commentator above cited at 289 to 309.

The extent of the power of the Legislature to pass retrospective laws is found in a summary at p. 548. Acts changing remedies and giving remedies are not, strictly speaking, retroactive. Acts affecting the legal character of past transactions are valid when they affect past transactions which are *per se legal,* unless tainted by an illegal act (or purpose) growing out of extraneous matters, to the extent of curing *defects* or *omissions ;* where, in other words, the parties intending to do a legal act omit some formality or incident, which renders the execution imperfect. See *Jones* v. *Pratt,* 25 Vermt. R. 303.

The case we have is a case where the purpose was illegal, and no omission of form is complained of. It is not for want of form but for want of substance. The claim is not that the contract is defectively executed, or imperfectly executed, not fulfilling the intent of the parties; but that, that intent being illegal and against public policy so as to render the object and intent void, the Legislature has power to alter the *character* of the acts contemplated.

Amongst the exceptions to the general doctrine condemning retroactive legislation are Acts affecting public municipal corporations. This exception relates to alterations of their charters, as between the government and the municipal body, and is founded on the idea that the franchises or powers are political, and does not refer to contracts made *by the corporation with individuals,* for these are as much private and within the protection of the constitution as any other contract between individuals.

*W. Yerger,* for defendant in error.

In 1856, it being desired by the city of Jackson that a hotel should be erected therein, a contract was entered into between the mayor and aldermen of the place and James H. Bowman in relation thereto, by which Bowman undertook to build and did build the hotel in accordance with the terms of the contract. Among the inducements to engage in building it was an agreement by the corporation to confer on him for five years, upon

his obtaining the requisite majority of inhabitants, a right to retail liquors for a period of five years. It was further stipulated by the board that they "would not grant any license to any other person or persons to retail vinous and spirituous liquors, or either, in said city, unless the person or persons applying for license should bind themselves to erect a hotel in said city, the cost of which shall not be less than forty thousand dollars; and in case any such license shall be issued to any other person or persons except as above stated, or if license shall not be issued to said Bowman, &c., then the said mayor and aldermen bind themselves, &c., to pay to said Bowman, &c., the full sum of five thousand dollars, as a donation for the erection of said hotel."

The corporation granted license to another party without his complying with the above stipulations, and Bowman has sued to recover the five thousand dollars. It is objected that this contract was illegal and void, and that the corporation had no power to make it. The illegality of the contract has been placed by the counsel for the city upon a violation of the Act of 1842, in reference to the retail of vinous and spirituous liquors. In looking at that Act, it will be seen that there is not a single provision of it which declares that such a contract shall not be made or which prohibits a party from making it. Prior to 1842, by the Act of 1839, the retail of vinous and spirituous liquors in less quantity than a gallon was absolutely prohibited. The Act of 1842 so far modified the Act of 1839 as to *empower* the corporations of cities having two thousand inhabitants, and the board of police in other cases, to license the retail of liquors. The law did not *require* them to grant such license. It did not direct to whom, to what number, or when such license should be granted; but left the whole subject to the discretion and control of the corporations and boards of police. The second section of the Act of 1842 declares "that the corporate authorities of each and every incorporated city having a population of two thousand inhabitants *shall have power to grant to any free white* person, resident in said town, license to sell by retail," &c. Here, then, is a mere permission and discretionary power to the corporate authorities of certain towns to grant licenses—not a man-

date or requirement on them to grant. Of course, then, the number of persons to whom this license shall be granted, the kind of person and character to whom it shall be granted, is left, and wisely left, by the Legislature, to the discretionary control of the corporate authorities of the town. This being the case, there was nothing in the Act prohibiting—there is certainly nothing in the policy of the law prohibiting—the corporation entering into a contract with an individual by which they bind themselves for a good and valuable consideration to pay a party for improvements made by him in said city, and at their request, which he was induced to make in consequence of an agreement to grant him such license, and not to grant it to others but on condition of making such payment to him. This contract does not bind the corporation not to grant license to any one else, but only to pay Bowman a certain *bonus* for the work done by him, provided they do grant such license and thereby impair the value of his property, and throw a loss on him which he would not have sustained but in consequence of such act of the corporation. This contract violates no prohibition of the law. It undertakes to do nothing which the law has denounced. It agrees to leave nothing undone which the law commanded, but simply to indemnify a party against loss he may sustain in a contract entered into at their request, provided they exercise a discretionary power which may result to his prejudice.

2. But it is said the mayor and aldermen had *no power* under their charter to make this contract. I am at a loss to conceive the force of this position. The mayor and aldermen are made a body politic and corporate, and "shall have and exercise all the powers, rights, and privileges usually appertaining or belonging to bodies politic and corporate." Among these incidents are the rights to make contracts touching such public works and improvements as in the opinion of the mayor and aldermen will tend to advance the prosperity and promote the interests of the town and its inhabitants. A power to contract for grading and paving streets, for erecting water-works, for buying fire-engines, erecting engine-houses, building bridges, city halls, town prisons, &c., are unquestionably within the power and scope of the corporate franchise. Why not the erec-

tion of a hotel necessary to the entertainment of guests, who, for the purposes of business and in the performance of their public duties, are required to visit and remain in the town, I am at a loss to perceive. In the case of the corporation of Jackson, the Legislature, the courts, Federal and State, were by law held there, and the prosperity of the town mainly depended upon them; and surely, when a suggestion was entertained by the Legislature to remove the seat of government for want of hotel accommodation, it was a wise and prudent exercise of corporate power and discretion to contract with a party for the erection of such a hotel as would accommodate the public and enhance the prosperity of the town. But if the exercise of this power was doubtful, the court would not declare the contract void. It would, under the circumstances of this case, require a palpable violation of law and want of authority to induce the court to sustain a defence absolutely without merit in itself and against the principles of morality which between man and man should be observed.

3. But conceding that at the time this contract was made in 1856 it would not have been enforced, because the corporation had no power to make it, or because it was against public policy to make and to enforce it, that objection has been entirely removed, that defect covered, by the Act of November 19, 1857, p. 135 of Acts. That Act is entitled "An Act for the relief of James H. Bowman, and to enable a contract entered into between him and the mayor and aldermen of the city of Jackson to be carried into effect according to its terms." The preamble recites the contract, and declares that the mayor and aldermen *desire* that the same may be ratified and confirmed by the Legislature. The Act then enacts that "the mayor and aldermen be and they are hereby empowered to carry into effect said contract entered into with said Bowman on the 7th day of July, 1856," &c.

Now it will be observed that there had been a contract in fact entered into between the corporation of Jackson and Bowman. It will also be observed that the corporation of Jackson *desire* that contract to be enforced and carried into effect. It is supposed by some that the contract may be impeached for want

of power in the corporation making it, or because it might seem to violate the public policy. Under these circumstances the aid of the Legislature is invoked to ratify the act previously done, to give the necessary power, and to waive for the public the objection to its legality ; and these things the Legislature does do, in accordance with the wishes of the party and at the *desire* of the corporation. But it is said this law is void, and will not be enforced. Why? It is not suggested that it violates any particular clause or regulation of the constitution of the State or of the United States. It is not suggested that it "impairs the obligation of a contract;" on the contrary it removes a legal impediment to the enforcement by law of a contract actually made between the parties. But it is said it is retrospective. It divests a vested right, and is therefore void. That a law is retrospective does not, under the jurisprudence of this State or of the United States, render it void. The Legislature of the State, having full legislative power, except where restricted by the constitution of the United States or the State constitution, may pass retrospective laws. This power has been repeatedly exercised by the Legislature of this State and every other State, and unless the laws were obnoxious to some other objection than mere *retrospection* they have always been upheld.

Counsel for the plaintiff in error have cited Smith's Commentaries on Constitutional Law, in which the author, without citing decisions, gives it as his opinion that retrospective laws should not be enforced. Among cases referred to by the author is the case of *Worrill* v. *Sherburn*, 1 N. H. R. 213. Retrospective laws were, in direct terms, prohibited by the Legislature of New Hampshire. The remarks of Woodbury, J., touching the general question, are therefore only *obiter dictum*—extra-judicial in their character. But even he says he wishes it distinctly understood that this constitutional provision does not apply, "unless it operates upon the interest of individuals or *of private corporations,* nor when in *any implied or express manner* the parties affected had consented to their passage." 1 N. H. R. 213. This is very conclusive against the plaintiff in error, which is a public corporation and has expressly assented to the law ; in fact, the law, as the preamble shows, was passed at their "desire."

But, again, in the case of *Satterlee* v. *Matthews*, 2 Peters, 380, the Supreme Court of the United States upheld a statute which made valid a void contract. A similar doctrine was affirmed in *Webb* v. *Derr*, 17 How. 576. So, also, in *Wilkinson* v. *Leland*, 2 Peters, 627 ; also same parties in 16 Peters, 294. Likewise the same principle is upheld and announced in *Watson* v. *Mercer*, 8 Peters, 88 ; and in *Crawford* v. *Branch Bank of Mobile*, 7 How. 279.

But of what does the plaintiff in error object in this Act of the Legislature ? He does not pretend that he did not make the contract. He does not pretend that it was not intended, when it was made, that it should be enforced. He does not pretend that Bowman has not dealt on the faith of it—has not invested his money in consideration of it—has not dealt and trusted in perfect good faith throughout. Aye, but, says plaintiff in error, I admit these things ; but my contract was void, because we have acted against the policy of the law in making it. For a long time it was extremely doubtful whether a party would be heard, to avoid his actual contract by pleading its illegality, whether he should defend, both parties being " *in pari delicto*." But Lord Mansfield, with that sagacity and comprehensiveness for which he was so eminent, at last in the case of *Newman* v. *Halman*, 1 Cowper, 341, placed the whole case on its true ground. He says : " The objection that a contract is immoral or illegal as between plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded in general principles of public policy, which the defendant has the advantage of, contrary to real justice as between him and the plaintiff, by accident I may say. The court goes upon the ground that it will not lend its aid to a plaintiff whose cause of action is founded upon an illegal consideration, or is against a positive statute. This is done for the public, not for the sake of the defendant, but because the court will not lend its aid to the plaintiff. But when the public, by Act of Legislature, in the name of the public, waive the wrong, ratify the Act, and consent to its enforcement, how then can a defendant claim an objection ? The defence was never allowed for his sake. The court, acting

for .the public, would not enforce the contract often against the real justice between the parties. But when the public steps aside, saying, I do not complain ; I ratify and approve the Act : what becomes of the defence of the defendant? His counsel says, this Act of the Legislature has deprived him of a vested right. How vested? What right? A right to set up the public policy—a right to insist on the violated law, when the public itself has waived it. Surely such a defence is fallacious. It is not founded in conscience; it is contrary to the real justice ; and the public, stepping aside, leaves the parties to decide the controversy on its merits between them."

A contract of sale, made by an administrator, of the lands of a decedent, without a regular order of Probate Court and notice to the heirs, has been repeatedly held to be void by this court, and a note given for the purchase-money declared invalid. But the court says, if the heir, for whose benefit this note is declared to be invalid and this contract to be void, ratify it after the sale, by relation the contract shall take effect, and a recovery may be had upon the note. The analogy between that case and this is very strong. But it is very clear that the reasons for enforcing the present contract are much the stronger.

HARRIS, J., delivered the opinion of the court :

The defendant in error filed his action of covenant in the court below against the plaintiff, to recover damages for the breach of the following agreement, to wit :

"Articles of agreement, made and entered into on this the 7th day of July, 1856, between the mayor and aldermen of Jackson, State of Mississippi, of the first part, and James H. Bowman, of said city, of the second part, witnesseth : that whereas a commodious hotel is greatly needed and desired for the accommodation of the public in said city, and the parties of the first part are willing to aid in the erection of said building, and thus fulfil the wishes of the inhabitants of said city, by granting the privileges and exemptions hereinafter named ; and the said party of the second part, being hereunto solicited by the parties of the first part, and divers lawful voters of said city, has consented and agreed to cause to be erected a hotel building, on fractional

square No. 1, north, in said city, of the description and dimensions stated in the plan of said building which has been submitted to, and approved by, the board of mayor and aldermen of the city of Jackson, upon the conditions hereinafter named, and certain donations from individuals of said city : Now, therefore, the said parties of the first part, in consideration of the premises, and of the stipulations hereinafter contained, and of the sum of ten dollars, to the said parties of the first part in cash paid for the party of the second part, the receipt whereof is hereby acknowledged, do for themselves and their successors in office hereby covenant, promise, and agree to and with the said James H. Bowman, his heirs, executors, administrators, and assigns, as follows, to wit :

" First, that the lot of ground upon which said hotel shall be erected, and all the buildings and structures thereon, and all the fixtures and furniture of said hotel buildings, and all the servants, horses, hacks, or other property that may be employed in or about said hotel, shall be and remain wholly and entirely free and exempt from all city taxes, impositions, and charges of every kind and nature whatever, for and during the period of five years from the completion of said hotel and the opening thereof for the reception of guests.

" Secondly, that the said party of the second part, his heirs, and executors, administrators, and assigns, shall be authorized and permitted to have and keep for public use, at such rate of charge as he or they may deem proper, billiard tables and tenpin alleys upon any part of said square, and hold the same for the period of five years, commencing from the completion of said hotel, wholly and entirely free and exempt from any city tax, imposition, or charge, on account of same.

" Thirdly, the said parties of the first part, and their successors in office, shall issue to said party of the second part, his heirs, executors, administrators, and assigns, immediately upon the completion and opening of said hotel as aforesaid, upon a compliance by him or them with the conditions prescribed by law— to wit, upon the petition of the majority of the legal voters of the city of Jackson therefor—license to sell, by retail, in any quantity, vinous and spirituous liquors on any part of said square, for the

period of twelve months from the date of such license, which license shall be annually renewed to said Bowman, his heirs, executors, administrators, and assigns, upon the like petition being by him or them presented to the board of mayor and aldermen of the city of Jackson, for the period of five years, commencing from the completion of said hotel, and the charge for such license shall not exceed the lowest rate at which license to retail vinous and spirituous liquors may by law be granted; and that they will also grant forthwith, and at the rate aforesaid, upon a petitional majority of the legal voters of this city therefor, license to the said Bowman or his assigns to retail vinous and spirituous liquors, in any quantity, in any house in the said city that he or they may designate, for the period of twelve months from the date of such license, and the same to renew as aforesaid until said hotel is completed and opened as aforesaid; and that they will also pay over to him or them such sums as may be by him or them paid for such license, such payment by the city being a further donation for the erection of said hotel.

"Fourthly, the said parties of the first part will not, nor shall their successors in office, during any of the periods aforesaid, grant any license to any other person or persons applying for license to retail vinous and spirituous liquors, or either, in said city, unless such person or persons shall bind themselves to erect a hotel in said city, the costs of which shall not be less than forty thousand dollars; and in case any such license shall be issued to any other person or persons except as above stated, or if license shall not be duly issued to the said James H. Bowman, his heirs, executors, administrators, and assigns, upon the petition of a majority of the legal voters of the city of Jackson therefor, for the period aforesaid, as herein provided, then the said parties of the first part hereby bind themselves and their successors in office to pay to the said James H. Bowman, his heirs, executors, administrators, and assigns, the full sum of five thousand dollars as a donation for the erection of said hotel.

"But these grants and privileges are upon conditions that the said James H. Bowman shall erect or cause to be erected and completed upon said square, on or before the first day of December, A. D. 1857, a hotel containing from eighty-five to one hundred

rooms, the plan whereof has been approved by the said parties of the first part, and is now filed with the clerk of the city of Jackson; and in the event that said hotel is not completed on or before said date, this agreement is to be null and void.

"And the said James H. Bowman hereby covenants and agrees in consideration of the premises, that he will erect or cause to be erected and completed said hotel within the period limited, to wit, on or before the first day of December, 1857; and in default thereof hereby binds himself, his heirs, executors, administrators, and assigns, to pay to the mayor and aldermen of the city of Jackson, and their successors in office, the full sum of five thousand dollars, which sum is agreed on by the parties to this contract as liquidated damages to be paid by said Bowman upon a breach of this contract by him.

" In testimony whereof, William H. Taylor, Mayor of the city of Jackson, has hereunto affixed his hand and the corporate seal of said city; and James H. Bowman has hereunto affixed his hand and seal, this the day and year above written.

"WM. H. TAYLOR, *Mayor*.    [SEAL.]
"JAMES H. BOWMAN.    [SEAL.]"

The validity of this contract is the question submitted for our determination.

The power to grant licenses to retail vinous and spirituous liquors is not a corporate franchise, conferred on this corporation by its charter. Its charter is the law of its being, in the exercise of its corporate rights and powers. As a corporation, therefore, acting under its charter, it could do no act, nor make any contract, not authorized by it. We are then to look beyond its corporate character for the power in question.

Admitting that the plaintiff in error was a corporate city, having more than two thousand inhabitants, (which nowhere appears in this record,) the power to grant retail license, under certain limitations and restrictions, was conferred by the Act of 1842, p. 109. But this is a special and limited jurisdiction, conferred by a general law, for the public good, and both the extent of its power and the limits of its discretion are strictly measured and regulated in their exercise by that Act. It is not a private

right, nor an exclusive privilege, nor a public franchise granted to this corporation for the benefit of the city of Jackson as such corporation; but it is a naked power—a special duty—imposed by law upon this body, for the benefit of the public at large, which can only be exercised for the purpose, and in the manner, and according to the special provisions of the Act, and is wholly foreign to the objects and purposes for which the corporation was created. The corporation was only used as a convenient agent for the accomplishment of the purposes of the Act. Its object was twofold: 1st, to guard the community against the evils of numerous unrestrained retail shops; and, 2d, to make them a source of revenue for the benefit of common schools. The Act was subsequently amended so as to appropriate this revenue, in the city of Jackson, not to this corporation, but "to the education of poor children and the support of paupers." See Act of 1846, p. 105. In this respect, as aptly suggested by counsel for appellants, this corporation occupies the precise attitude of the boards of police in the respective counties, or of any other court acting under a special and limited power beyond its general or ordinary jurisdiction, and all the doctrines applicable to that class of cases apply strictly here.

This corporation could not dispense with the conditions and prerequisites upon which its power and jurisdiction to grant license depended. Nor could it, in violation of the statute, interpolate new conditions, precedent to the exercise of its power and discretion. The Legislature contemplated by this Act, 1st, that only the corporate authorities of towns and cities having two thousand inhabitants or more, and the boards of police of the respective counties, should exercise this power; 2d, that the license should be for one year; 3d, that the amount paid for such license should not be less than two hundred nor more than one thousand dollars; 4th, that the applicant should be a free white person resident in the city; 5th, that there should be a recommendation of five freeholders; 6th, that a bond should be executed; 7th, that the amount raised should be appropriated to the education of poor children and the support of paupers—by the amendment of 1846, p. 105, applicable to the city of Jackson; 8th, that no license should be delivered until the receipt of the

treasurer of the corporation for the tax should be produced. It was not in the power of this corporation to do any act, or to make any contract, in violation of the plain duties enjoined by these provisions. It was not in its power to *sell* a discretion and authority specially delegated to it to be used for the public good, and thereby prevent itself from the further exercise of such discretion and authority, from time to time, as the exigencies of the country might demand. It was not in its power, by contract, to divest itself of this public, official duty, irrevocably, for a term of years, for private benefit or local advantage.

No person, even so far back as the feudal ages, was permitted by law to stipulate for iniquity. *Ex turpi contractu actio non oritur* is the universal maxim of the courts in every period of English jurisprudence. Our American reports equally abound with cases of contracts declared illegal on account of the illegality of the consideration; and they contain striking illustrations of the general rule that contracts are illegal when founded upon a violation of public trust, or confidence, or duty, or the violation of public law. 2 Kent, 620–622; 1 Story Eq. Jur. p. 324, sec. 294. As to violate the license laws, *Ritchie* v. *Smith*, 6 C. B. R. 462.

The courts of the country will give no man a remedy on a contract made *in contemplation* of a violation of its laws. *Yewett* v. *Bartlett*, 21 Verm. R. 184; *Woottier* v. *Miller*, 7 S. & M. 385.

When we examine this contract in reference to the laws of this State existing at the time it was made, and in the light of these general principles, it is most apparent that not only its tendency, but its real design, was, to evade, defeat, and absolutely nullify the provisions of the Acts of 1842 and 1846. To enable the parties to the contract to erect a commodious hotel for the accommodation of the public in the city of Jackson, "by granting the privileges and exemptions" named in said contract, is *its declared purpose*—a purpose wholly foreign to the objects intended to be accomplished by this Act of 1842, and inconsistent with the just exercise of the power and discretion vested in the corporation by that Act for the public good.

The contract next proceeds to violate the letter and spirit of the Act of 1842, by obligating the authorities of the city of

Jackson, without regard to the conduct of Bowman under his license, to renew it annually for *five* years, whether he shows himself to be a proper person to whom the license should be granted or not; thus *selling* or donating away—irrevocably—the power and discretion vested in them by law, to be exercised from year to year, in preventing the abuse of the license, and vesting the *right* in Bowman, by contract, to exercise this privilege for *five years:*

They next obligate themselves to grant him the license annually for five years, *"at the lowest rate at which license to retail vinous and spirituous liquors may by law be granted;"* thus parting with their power and discretion, in view of all circumstances surrounding them, to demand from the grantee of such license the highest or any intermediate sum therefor between two hundred and one thousand dollars, according to the provisions of the Act of 1842.

They next obligate themselves "annually to renew said license to said Bowman, his heirs, executors, administrators, *and assigns,"* in violation of the fourth section of the Act of 1842, declaring such license "a personal privilege, not transferable from one person to another."

They next bind themselves to violate a positive trust and duty, enjoined upon them by the Act of 1846, appropriating the license fund in the city of Jackson *" to the education of poor children and the support of paupers" therein,* and agree to donate it to Bowman for *five* years, to build a commodious hotel in said city for the accommodation of the public at large; and not only so, but they undertake, further, to bind their *successors in office* to a like disregard of their social duty, and a like violation of a positive law.

They lastly obligate themselves to grant to Bowman all these privileges, to the exclusion of all other persons, until such persons shall bind themselves to erect a hotel in said city the cost of which shall not be less than forty thousand dollars—a condition not authorized by the statute from which they derive their authority.

That a contract thus vicious, fraudulent, evasive, and illegal upon its face, cannot be enforced is too obvious to require argument.

That it is dressed in the language of *donation* does not change the character of the contract. It is *obvious* that the five thousand dollars agreed to be *donated* was intended as a penalty, to induce the violation of a public duty, and the violation of a public law, by the authorities of the city of Jackson, for the private advantage of James H. Bowman. Perhaps such public benefits as the world at large might be able to obtain by availing themselves of a "commodious hotel" in the city of Jackson, and paying a full equivalent therefor, and the further benefits that other citizens of Jackson might glean from temporary sojourners, were also considerations and inducements to this contract.

But the first and leading design intended to be covered by this transparent pretence of public advantage was the violation of the statute, and the flagrant abuse of the power and discretion vested in this corporation for wholly different objects.

It is clear that the Act of 1857 does not sanctify this wrong nor attempt to give it validity, even if the Legislature had the power. It is true the Act says, "the mayor and aldermen of the city of Jackson are *authorized and empowered* to carry into effect said contract." But they choose to repudiate it, and have the right to do so. Indeed it is their duty to do so, as it violates their public duty.

Let the judgment be reversed, and judgment rendered here for the defendant below on the demurrer to the declaration.